**James Kenneth BALE, Plaintiff,**

v.

**GLASGOW TOBACCO BOARD OF TRADE, INC., Defendant.**

No. 953.

United States District Court
W. D. Kentucky,
Bowling Green Division.

Nov. 4, 1963.

Huddleston & Huddleston, Bowling Green, Ky., for plaintiff.

Berry & Floyd, New Castle, Ky., for defendant.

SWINFORD, District Judge.

This is an action for an injunction against certain practices carried on by the defendant in connection with regulating the Glasgow tobacco market which are alleged to violate the Sherman Antitrust Act (15 U.S.C.A. § 1 et seq.). Jurisdiction is conferred on the Court by 15 U.S.C. § 26. The case has been submitted on a joint motion for summary judgment by the plaintiff and defendant.

The plaintiff is the owner of a tobacco auction warehouse in Glasgow which has been recently constructed in readiness for the 1963–64 sales season which begins on November 25, 1963. The defendant is a tobacco board of trade, a non-profit corporation owned by sales warehouse operators in the Glasgow area and organized under Ky.Rev.Stat. 248.015. This statute declares that a board of trade shall be organized on every tobacco market and that among its purposes shall be the promotion of orderly sales and the allocation of selling time and selling space. The manner in which the Glasgow Board of Trade has allocated the selling time among the warehouses on the Glasgow market constitutes the alleged violation of the Sherman Act.

A full appreciation of the matters involved in this controversy entails familiarity with certain general information pertaining to the tobacco industry and the method of operation of the tobacco markets. Virtually all of the burley tobacco grown in the United States is sold in 61 auction markets located mainly in Kentucky and Tennessee. The Glasgow market ranked fifth in volume sold among these markets during the 1962–63 season. 19,506,436 pounds of tobacco were sold in Glasgow out of total for all of the markets of 703,955,750 pounds. The trend in burley tobacco production has been irregularly upward. The total sales in 1932 amounted to some 324 million pounds; in 1947 they had increased to 500 million; in 1952 to 689 million; in 1957 they declined to 519 million. The 1962 crop is the largest on record. The sales in Glasgow have generally followed the national trend: the last crop was the largest ever sold; sales in 1952 were 18.6 million pounds and in 1957, 15.2 million pounds. Inconstancy in the direction of the quantity produced can be accounted

for by a number of causes; weather, cultural practices, governmental controls. See 7 U.S.C.A. § 1281 et seq.

Between mid-August and mid-September burley tobacco is harvested and hung in vented barns for a period of air-curing while the leaves are still on the stalk. After the leaves have cured, they are stripped from the stalks and tied into bundles called "hands". It is then ready to be sold. The farmer hauls his tobacco to a sales warehouse, a large, low building, where the tobacco is placed on the floor in baskets and auctioned off in the presence of buyers for the large tobacco companies and for various independent firms. The markets open in late-November and sales are carried on as long as there is tobacco remaining to be sold in the area served by the respective markets, generally amounting to from four to six weeks. It is very much to the producer's advantage, however, to get his crop to the market early so that he is relieved of the risk of loss, a considerable subject throughout all phases of the production process.

The amount of tobacco that can be sold on one market in a day depends ultimately on the capacity of the processing machinery located within convenient range of the market. After tobacco has been removed from the sales floor, it must first be sorted and cleaned, the moisture content must be precisely regulated, the stems must be removed, all in preparation for compressing the leaf into hogsheads for further curing and storage. Since the buying companies have only limited space for storage of the tobacco in loose-leaf form, these processes must be carried out shortly after it is purchased.

The buying companies generally assign one or more buyers to each market. One such representative from each of the companies buying on a market is known as a "set" of buyers. There are two sets of buyers assigned to the Glasgow market. Owing to the limited time which the buyers can spend on the warehouse floors each day and the amount of time required for each unit of sale, it has been determined that a set of buyers will only purchase 1260 baskets of tobacco in a day. A "basket" is a stack of tobacco varying in weight up to 700 pounds and constitutes the subject matter of each sale in the auction. Thus with two sets of buyers available on the market, the amount of sales cannot exceed 2520 baskets each day.

As has been demonstrated, this limitation is a product of certain natural and economic forces over which the parties to this case have no control. It has always been a practice of the warehouse operators to divide this daily market capacity among themselves, as a matter of custom or mutual consent before 1937, and subsequently by regulation of the Glasgow Tobacco Board of Trade. Consensual division of the market capacity, absent other circumstances is unassailable, for it is not in the direction of the tobacco buyers that the warehouse operators look for their market. They sell their services to the farmers and it is for contracts with the farmers that they are expected to compete with each other. The plaintiff contends however that the allocation of selling capacity by the regulations of the Defendant Board of Trade presently in force is conducted in a way that suppresses or forecloses competition by new operators.

The plaintiff has recently constructed warehouse facilities about a mile outside Glasgow. The building is 704 feet long and 384 feet wide and has 250,000 square feet of floor space available for selling tobacco. His is the first new warehouse built in Glasgow since 1956, though there were additions to existing warehouses in 1961 totaling some 46,000 square feet of selling space. Plaintiff's building is appraised at $500,000. There are presently ten warehouses on the market besides the plaintiff's.

In November 1961, the Board of Trade adopted a bylaw which allotted to each member warehouse a specified number of baskets of tobacco that might be sold on each sale day. It is stipulated that these allotments were directly proportionate to the amount of floor space in the re-

spective warehouses. The allotments ranged from 231 baskets for the Wells Tobacco Warehouse to 599 baskets for the Farmers Tobacco Warehouse. A second bylaw provided that new warehouses or additions to existing warehouses would be allotted selling time during their first year of operation proportionately to 20% of the floor space in the addition and that in each subsequent year another 20% would be considered in the computation until the fifth year when all of the added floor space would be given effect in determining allotments of selling time. As it applies to the case at bar, the regulation would allocate selling time to the plaintiff in the proportion that 50,000, 20% of plaintiff's floor space, bears to 773,046, the aggregate selling space on the Glasgow market. The result of this computation is that plaintiff would be entitled to 6.77% of the selling time. If the plaintiff were allotted selling time in the manner accorded to all of the other operators, his basis would be 250,000 to 991,624 or 25% of the selling time.

In April, 1963, plaintiff met with representatives of the Board of Trade, informed them of his intent to build a new warehouse and requested that he be assigned selling time in the ratio that his warehouse would bear to the total market space. He was subsequently informed that selling time would be apportioned in accordance with the formula described above. He proceeded with construction and commenced this action.

Plaintiff has borrowed $350,000 to build his warehouse. His interest payment the first year will be $17,850 and he is obligated to repay principal in the amount of $28,000 for a total commitment of $48,850. It has been conceded that his total commissions under the selling time that would be allotted to him under the defendant's regulations could amount to no more than $35,000 or $36,000 during the first year of operation.

■■ It has been amply demonstrated that regulation of these auction markets is a necessity which the persons involved in them cannot control. There is a limited amount of selling time available and there must be some method of apportioning it. Free and unrestricted competition for the time of the company buyers could well result in destructive practices and evils far greater than any alleged to have occurred here. Regulation designed to mitigate or prevent such consequences is clearly permissable. Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); Rogers v. Douglas Tobacco Board of Trade, 5th Cir., 244 F.2d 471 (1957). But it happens in this case that regulation for this desirable and permissible end has been converted to an instrument for the suppression of competition. The regulation allotting selling time in accordance with only 20% of the new construction makes it problematical whether the addition to the market can be economically feasible. It is common knowledge that the first few years of any new enterprise are the most critical. Here, the defendant's regulation would so far compound the ordinary crises of a new venture as to make its survival highly doubtful. It has been demonstrated that the returns to the plaintiff during the first year of operation under the regulation would be insufficient to pay his obligations on his notes, let alone pay his operating costs and yield him a return on his investment and efforts. The regulation ordains economic failure to anyone who would pose a competitive challenge to the present operators.

■ Moreover the arguments, materials in the record and the overall scheme of the regulation evidence a purpose to forestall the entry of new competition on the Glasgow market. It is argued in favor of the regulation that the operators now on the market have a two-million dollar investment which is entitled to protection; that they are first in time and therefore are entitled to precedence in the allocation of selling time; that controls and regulations may and should be designed to prevent "building wars"; that entry of new operators would aggravate problems and disrupt market conditions; that the present warehouse space is more than adequate to supply the mar-

ket. These statements might be employed to defend a trust, a monopoly or any other illegal restraint of trade. These expressions are all reducible to the proposition that the present operators find that new competition would be undesirable and that the regulation complained of was adopted to suppress it. An undertaking which has as its necessary purpose and effect frustration of competition in a substantial market is per se an unreasonable restraint of trade under Section 1 of the Sherman Act. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

In American Federation of Tobacco Growers v. Neal, 4th Cir., 183 F.2d 869 (1950) the board of trade in Danville, Virginia denied membership to the plaintiff on the ground that he had built his warehouse outside the city limits. It developed that this denial of membership made it impossible for the plaintiff to do business. In holding that the action of the board was an unreasonable restraint of trades Judge Parker set forth certain reasoning which is peculiarly applicable to the case at bar:

> "As to the contention that the restraint of trade here involved was a reasonable one, it is a sufficient answer that the effect of the action of the defendants was to exclude a competitor from a substantial market in interstate commerce; and it is well settled that such exclusion is unreasonable per se. 'The purpose of the anti-trust laws—an intendment to secure equality of opportunity—is thwarted if group-power is utilized to eliminate a competitor who is equiped to compete'. William Goldman Theatres v. Loew's, Inc., * *. 'Not only is price fixing unreasonable, per se, * * * but also it is unreasonable, per se to foreclose competitors from any substantial market.' International Salt Co. v. United States, * * *; Fashion Originators Guild v. Federal Trade

Commission, * * *. 'The anti-trust laws are as much violated by the prevention of competition as by its destruction * * *. It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.' United States v. Griffith, * * *. See also Fashion Originators Guild v. Federal Trade Commission, * * *; American Medical Ass'n v. United States, * * *. Id. 183 F.2d at 873.

Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 1st Cir., 194 F.2d 484 involved a complaint under the antitrust laws by a dealer who had been excluded from a central produce market on the ground that he had violated a covenant in his lease against transfers of his interest in his business without consent of the defendant central market. The Court found in the cancellation of the lease a purpose to prevent competition and condemned the conduct of the defendant in the following language:

> "The district court interpreted the Sherman Act in this context as condoning defendants' monopoly position as long as competition ruled the ultimate selling market subsequent to Gamco's ouster. It happens to be true that the abuses of price fixing and price leadership have been traditional criteria of illegality under the Act. See, e. g., United States v. Trenton Potteries Co., * * *; Appalachian Coals, Inc., v. United States, * * *; United States v. Socony-Vacuum Oil Co., * * *. But there are other indicia of monopoly power, of which exclusion of competitors from the market is one, International Salt Co. v. United States, * * *, which are condemned per se by Section 2, regardless of whether or not the position of dominance has been exploited to rig prices. American Tobacco Co. v. United States, * * *; United States v. Aluminum Co. of America,

* * *. The Sherman Act condemns the power which makes pricing abuse possible as well as the abuse itself. United States v. Griffith, * * *. Where, as here, defendants enjoy a power to deny their competitors access to the market, 'evidence that competitive activity has not actually declined is inconclusive,' both as to Section 3 of the Clayton Act * * *, and for our present purposes under Sections 1 and 2 of the Sherman Antitrust Act." Id. 194 F.2d at 486.

██ Viewed in this light, the extent to which new floor space is discriminated against in the allocation of selling time is irrelevant. That it is discriminated against at all is sufficient to constitute an unreasonable restraint of trade where the purpose or effect of such discrimination is to stifle competition. If there were some other purpose for this discrimination than preservation of the economic status quo, the defendant had the burden of making an issue of it. As for instance in the Gamco Case:

"Admittedly the finite limitations of the building itself thrust monopoly power on the defendants, and they are not required to do the impossible in accepting indiscriminately all who would apply. Reasonable criteria of selection, therefore, such as lack of available space, financial unsoundness, or possibly low business or ethical standards, would not violate the standards of the Sherman Anti-trust Act. But the latent monopolist must justify the exclusion of a competitor from a market which he controls. Where, as here, a business group understandably susceptible to the temptations of exploiting. its natural advantage against competitors prohibits one previously acceptable from hawking his wares beside them any longer at the very moment of his affiliation with a potentially lower priced outsider, they may be called upon for a necessary explanation. The conjunction of power and motive to exclude with an exclusion not immediately and patently justified by reasonable business requirements establishes a prima facie case of the purpose to monopolize. Defendants thus had the duty to come forward and justify Gamco's ouster. * * *. We therefore hold that, although selection and discrimination among those who would become lessees was necessary, defendants have failed to show that the basis for their action here was innocent of the economic consideration alleged." Id. 194 F.2d at 487.

The opinions cited by counsel for defendant do not justify the method of allotting selling time practiced in this case.

In Rogers v. Douglas Tobacco Board of Trade, 5th Cir., 244 F.2d 471 (1957), the Board of Trade had been assigning selling time proportionately to the floor space in each warehouse until the plaintiff proposed to build a house that would have occupied 36% of the space in the market. The Board of Trade then changed their method of allocation so that selling time allocations were determined by the percentage of selling time utilized by each warehouse in the preceding year. New members were assigned selling time pro rata with all the other operators reduced in case the floor space of the new member were less than the average space in the other warehouses. While a different basis of assigning selling time was applied to new members, this was accounted for simply by the fact that the performance system, the method whereby selling time is allotted according to the previous year's operation, is not translatable to a new entrant. This is not discrimination directed at discouraging new competition, but discrimination arising by force of circumstances. The real controversy in the case involved a provision whereby gains or losses of selling time were limited by regulation to $3\frac{1}{2}\%$ between any two successive years. This was held unreasonable. See also the second opinion in this case. 266 F.2d 636 (1959).

In Asheville Tobacco Board of Trade v. Federal Trade Commission, 4th Cir., 263 F.2d 502 (1959), the allotments of selling time were made on the same basis as in the Rogers Case, supra. The Federal Trade Commission held the 3½% gain-loss limit to be an unreasonable restraint of trade and further held that it was illegal to allot selling time to new members on a straight pro rata basis without taking into account the *full* size of the new entrant. The Court affirmed the orders of the Commission except to the extent they required that credit be given the full size of the new entrant. The Court found and held that the prevention of overbuilding was a legitimate objective under the regulatory powers of the Board of Trade and that the Board need not take into account the total floor space of a new warehouse in determining its share of the selling time. The Court remanded to the Commission with the direction that its order be clarified with regard to whether it was meant to give credit for all of the floor space of a new warehouse or whether it was meant merely that the full floor space should be given reasonable weight in assigning selling time. In the second appeal of this case, 294 F.2d 619 (1961), the Commission had entered an order requiring that "reasonable credit" be given to the size and capacity of an entrant warehouse in allotting selling time. The Court held that this was not sufficiently specific and directed that the Commission order the Board to desist from allotting time on any basis that does not accord credit to the size of the entrant. This Court does not agree with the reasoning underlying these opinions and cannot otherwise justify a system of allocation that does not give credit to the *full* size and capacity of the new entrant where selling time is apportioned to all other warehouses on the basis of their *full* size. The Asheville Cases are predicated on the view that overbuilding is an evil against which the regulatory powers of a board of trade may be asserted to impose restraints consistently with the "rule of reason". Standard Oil Co. of New Jersey v. Unit-ed States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). This Court does not believe that overbuilding in this context is distinct from the excessive introduction of new business units into any other industry. The laws of supply and demand provide a sufficient remedy for whatever evils may arise in this way. To hold that the Board of Trade is permitted to determine whether a need for new facilities exists and to penalize new additions accordingly would be the equivalent of imparting to the Board jurisdiction to dispense certificates of convenience and necessity. There is nothing in the statutory origins of the Board (Ky. Rev.Stat. Chap. 248) to intimate that the tobacco sales business has been appropriated to the public utilities class. This Court must respectfully dissent from the reasoning of the Court in the Asheville cases with the admission that it has studied and reflected on them at great length.

The case of Wilson v. Shelbyville Tobacco Board of Trade, Eastern District of Kentucky, Frankfort, Docket No. 174, appears to have a system of allotting selling time identical to the one in this case. The complaint was dismissed, but by agreement of the parties. The Court does not know what the real basis of the resolution of this controversy may have been.

The record clearly reveals that the action of the Glasgow Tobacco Board of Trade is in positive, flagrant and direct disregard of the Sherman Antitrust Law. By combination and conspiracy the Board and its members have sought to place impediments and hazards in the way of persons who might seek to become new business competitors all to the injury of the farmers and other segments of the public in the Glasgow area. Their conduct has been in unreasonable restraint of trade. Far from offering to the farmers and others with whom the warehouses do business, the advantages of free and open competition for their business, the Board of Trade has secured to the existing warehouse operators an impunity in which they may repose ob-

livious of all demands and pressures for enhanced services or commuted charges.

The plaintiff has not joined the Board of Trade in order to preserve his right to protest the regulation dealing with allocation of selling time to new warehouses. KRS 248.035 requires that all warehouse operators be members of the board of trade for their market. While the defendant has not challenged the plaintiff's standing in this case, the order of this Court will be conditional upon the plaintiff's becoming a member.

A judgment will be entered this day enjoining the defendant and its members from enforcing or seeking to enforce against the plaintiff any system of selling time allocation which discriminates against him solely because he is a new operator.