Perry J. **GAINES, d/b/a Growers Tobacco Warehouse Company, et al.,**
Plaintiffs-Appellants,

v.

**CARROLLTON TOBACCO BOARD OF TRADE, INC., et al.,** Defendants-Appellees.

No. 73–1450.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 14, 1973.

Decided May 2, 1974.

Joseph R. Huddleston, Huddleston Brothers, Bowling Green, Ky., on brief, for plaintiffs-appellants.

John M. Berry, Berry & Floyd, New Castle, Ky., E. Gaines Davis, Jr., Frankfort, Ky., on brief, for defendants-appellees.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This is the second appeal in this antitrust case. Preceding the first appeal the District Court had found and en-

joined violations by defendants of the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. (1970). The court had, however, refused plaintiffs any damages on the ground that plaintiffs' conduct (in accepting the restrictions) had estopped them from claiming damages under the treble damages clause section of the Clayton Act, 15 U.S.C. § 15 (1970).

This court reversed as to the damage issue, holding that plaintiffs were not estopped and remanded the case to the District Court for trial of the damage issue. Gaines v. Carrollton Board of Trade, Inc., 386 F.2d 757 (6th Cir. 1967).

On remand the District Court took extensive testimony and found:

"It is undisputed that the plaintiffs were newcomers to the Carrollton Tobacco Market and their first year of operation was the 1962–1963 season. The Court is of the opinion that the evidence conclusively shows that the plaintiffs did not have a full floor of 'customer' tobacco during either of the subject selling years, and that they filled up their floor with 'house' tobacco, by actively entering into the tobacco market as buyers of tobacco.

"The evidence for the defendants further establishes that the plaintiffs' failure to secure a full floor of 'customer' tobacco under the allotted floor space was occasioned by the fact that tobacco producers did not, for various reasons which were referred to in the evidence, choose to sell their tobacco with a new and unproven warehouse.

"The plaintiffs have made a strenuous effort to establish that they suffered damages by reason of the regulation in question, and the amount of those damages; and although they are entitled to greater latitude of proof in a case of this type, nevertheless the burden is on the plaintiffs to prove by a fair preponderance of the evidence: First, that they have sustained damages; and Secondly, the amount of those damages.

"In this case, the Court is of the opinion, upon the entire record, that the plaintiffs have failed to sustain the burden of proof by showing either that they suffered damages by reason of the regulation in question, or the amount of those damages, and any conclusion to the contrary would be based upon sheer speculation."

After a review of this lengthy record, we are convinced that the crucial findings of fact of the District Court quoted above are clearly erroneous and we reverse and remand for computation of damages.

The background of these appeals is fully set forth in this court's opinion in Gaines v. Carrollton Tobacco Board of Trade, supra, and in Bale v. Glasgow Tobacco Board of Trade, Inc., 223 F. Supp. 739 (W.D.Ky.1963), aff'd, 339 F. 2d 281 (6th Cir. 1964). A brief description of the tobacco marketing system is nonetheless essential to an understanding of this case.

Under Kentucky law tobacco is sold by growers and bought by the tobacco companies on certain established markets. These markets are controlled by Boards of Trade established under state law (K.R.S. § 248.015). Because the number of tobacco auctioneers and buyers is limited on each market, selling time (the period of actual auctioning of tobacco with all buyers in attendance) is customarily divided in Kentucky between the warehouses in the market on the basis of the percentage of each warehouse's floor space compared to total warehouse floor space in the market concerned.

In 1959, however, the Carrollton Tobacco Board of Trade adopted a resolution which limited any new warehouse entering the market to 20% of its normal selling time quota during the first year of operation, with that quota to be increased to 40%, 60%, 80% and 100% in succeeding years.

In 1962 when the Gaines warehouse was built, protests against the 20% restriction led to amendment of the Carrollton Tobacco Board of Trade resolution so as to provide 40% of quota of selling time for a new warehouse in its first year of operation, followed by increases of 12% in each subsequent year

until 100% was reached. As the District Judge pointed out, since this resulted in lower quotas in the later years, it was hardly less restrictive than the original resolution.

Contrary to the findings of the District Judge quoted above, we believe that this record discloses that plaintiffs clearly suffered damages in both years at issue and that the record affords a basis for computation of those damages.

First, this record demonstrates conclusively that the specific purpose of the restrictions upon new warehouse operations imposed by the Carrollton Tobacco Board of Trade was to prevent competition. What District Judge Swinford said concerning a similar regulation at the Glasgow tobacco market was equally applicable to Carrollton:

> "The record clearly reveals that the action of the Glasgow Tobacco Board of Trade is in positive, flagrant and direct disregard of the Sherman Antitrust Law. By combination and conspiracy the Board and its members have sought to place impediments and hazards in the way of persons who might seek to become new business competitors all to the injury of the farmers and other segments of the public in the Glasgow area. Their conduct has been in unreasonable restraint of trade. Far from offering to the farmers and others with whom the warehouses do business, the advantages of free and open competition for their business, the Board of Trade has secured to the existing warehouse operators an impunity in which they may repose oblivious of all demands and pressures for enhanced services or commuted charges." Bale v. Glasgow Tobacco Board of Trade, Inc., 223 F. Supp. 739, 745–746 (W.D.Ky.1963).

Second, the Carrolltown Tobacco Board of Trade amended resolution which governed selling practices during the two years at issue herein, limited plaintiffs' new warehouse to 40% of its normal quota (based on ratio of its warehouse floor space to the total floor space of all warehouses in the market) in the first year of operation, followed by 52%, 64%, 76%, 88%, and 100% in the succeeding years. The severity of this restriction serves to argue strongly as a matter of common sense that *some* damage must have resulted.

Third, the antitrust violation involved in the Carrollton Tobacco Board of Trade amended resolution is of the per se variety (*see* United States v. Topco Associates, Inc., 405 U.S. 596, 607–608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)) in relation to which damages may be found on proofs which represent less than absolute certainty. Simpson v. Union Oil Co., 396 U.S. 13, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969) (Black, J., concurring in part and dissenting in part); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

Fourth, this record demonstrates clearly that 1962–63 and 1963–64 (the years of operation here at issue) were record crop years and that sales pressures were greatest prior to Christmas.

Fifth, the nearest and closest yardstick shows that a new warehouse opened the same year in the Madison, Indiana, market without the anticompetitive restriction of Carrollton and sold its full quota of tobacco. It was operated by the same persons who are appellants in our instant appeal.

Sixth, the detailed comparisons of the sales of the Gaines Tobacco Warehouse in the two years operated under restrictions compared to subsequent years operated without them (as shown in plaintiffs' exhibits) serve to demonstrate damages and may be used to compute same. We regard this basis for computation of damages as somewhat more definite than, and certainly consistent with the spirit of the most recent detailed treatment of antitrust damages in the Supreme Court of the United States. In Zenith Radio Corp. v. Hazeltine Research, Inc., the United States Supreme Court said:

> "Trial and appellate courts alike must also observe the practical limits

of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).[1]

In comparision to these facts, we do not find the arguments for Carrollton Board of Trade to be persuasive. Appellees argue primarily that the fact that in the years 1962–63 and 1963–64 appellants used a portion of its restricted selling time for the sale of "leaf" tobacco was conclusive proof that as new entrants on the market appellants could not have gotten any more commission business than they did. "Leaf" tobacco is a term of art used to designate tobacco which the warehouse purchased from farmers and owned as opposed to tobacco owned by farmers upon which the warehouse would get a commission. Appellees contend that leaf tobacco selling was purely speculative and a poor business practice. This record, however, shows that appellants' sales of leaf tobacco were generally profitable. It also shows that both under the restriction and afterwards appellants' percentages of sales tended to approximate the percentage of selling time which was available to them.

This last fact we regard as specific confirmation of the position taken by appellee Carrollton Tobacco Board of Trade before this court in its brief amicus curiae in Bale v. Glasgow Tobacco Board of Trade, Inc., 339 F.2d 281 (6th Cir. 1964), after the events in this litigation had occurred. There appellees said:

"A new entrant without a single customer among the growers—indeed, one who is completely unknown to any grower in the area, and whose facilities and service are actually inferior —can (unless restrained in some way) acquire half the business of the market by merely building a warehouse containing as many square feet of floor space as is contained by all of the other warehouses combined! He can do this even though the existing warehouse space is more than adequate to handle the growers' crops, since the grower is under heavy pressure to get an early sale of his crop. If half of the sales are to be held at the newcomer's warehouse, he will quickly acquire half or nearly half of the market without the necessity of exerting any of the competitive forces (such as lower commissions or better services) which the Sherman Act sought to protect." Brief Amicus Curiae of Carrollton Tobacco Board of Trade, Inc., at 14–15.

On remand we believe the District Judge could most effectively compute damages on the before and after method outlined in Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 358 F.2d 790 (6th Cir. 1966). See also Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

Reversed and remanded for computation of damages in favor of appellants, in accordance with this opinion.

1. The history of the litigation of the damage issue is as follows: The district court allowed the damages sustained by Zenith as estimated by their own experienced officials. Hazeltine Research, Inc. v. Zenith Radio Corp., 239 F.Supp. 51, 76 (N.D.Ill.1965); the appeals court reversed on this issue, holding Zenith had failed to prove the fact of damage with respect to the Canadian pools as a proximate result of the alleged unlawful conspiratorial activities. Hazeltine Research, Inc. v. Zenith Radio Corp., 388 F.2d 25, 35–39 (7th Cir. 1967); the Supreme Court reversed and remanded for the judgment of the district court to be reinstated. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 116–125 (1969); on remand the appeals court formulated a "measure of proof," Hazeltine Research, Inc. v. Zenith Radio Corp., 418 F.2d 21, 25–26 (7th Cir. 1969), but on appeal the Supreme Court, without discussion of this standard, ordered the court to reinstate the original district court judgment with respect to the Canadian market. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 349, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).