Philadelphia Fresh Food Terminal Corporation et al., Appellants, *v.*
M. Levin & Co. et al., Appellants.

288

Argued December 12, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Judith R. Cohn,* with her *Wolf, Block, Schorr & Solis-Cohen,* for appellant at No. 1944.

*Louis J. Di Giacomo,* with him *Philips, Curtin & Di Giacomo,* for appellants at No. 1970.

*Louis J. Di Giacomo,* with him *Philips, Curtin & Di Giacomo,* for appellees at No. 1944.

*Howard R. Flaxman, Jerome E. Ornsteen,* and *Fox, Rothschild, O'Brien & Frankel,* submitted a brief for appellees at No. 1970.

OPINION BY PRICE, J., March 29, 1976:

On January 10, 1972, Philadelphia Fresh Food Terminal Corporation (Terminal Corp.) and certain named individuals who are stockholders and tenants of Terminal Corp., commenced an action in equity on behalf of themselves and all other shareholders and tenants of Terminal Corp. against M. Levin & Company[1] (Levin Company) and the Food Center Corporation (Food Corporation) which controls the Food Distribution Center (Center). Terminal Corp. and the named individuals argue that there are certain covenants running with the land, as provided for in the Redevelopment Contract, which restrict the sales of the various commodities within the Center to those areas which are designated for that commodity, and which forbid such sales in any other area. As a result of these covenants, Terminal Corp. and the named individuals contend that fresh fruit and produce in the original container can only be sold from the land leased by Terminal Corp. They therefore seek to enjoin Levin Company from selling fresh fruit and produce inside the Center, but outside the area designated for sales of produce, and they also seek to enjoin Food Corporation from selling or leasing land to anyone except Terminal Corp., for the sale of fresh fruit and produce in the original containers.

The lower court determined that Food Corporation could not sell or lease land for the sale of produce to anyone except Terminal Corp. The court also determined that Levin Company was violating the covenants by selling produce, but that Terminal Corp. and the named individuals were estopped from enforcing the covenants because they had participated in the breach. Terminal Corp., the named individuals, and Food Corporation all appealed this adjudication. We find that the lower court was correct in enjoining Food Corporation from such sales or leases. However, we find that the court erred in

---

1. M. Levin Investment Corporation was also an original defendant in this suit, but has since merged with M. Levin & Company, leaving M. Levin & Company as the surviving corporation.

not enforcing the covenants against Levin Company, and we will, therefore, affirm in part and reverse in part.

The scope of appellate review in equity cases is quite clear. A chancellor's findings of fact, when approved by the court en banc, have the force and effect of a jury verdict and will not be disturbed on appeal if supported by adequate evidence. *Herwood v. Herwood*, 461 Pa. 322, 336 A.2d 306 (1975). However, the chancellor's inferences and conclusions which are drawn from the facts, and the application of the law are always subject to review. *Adler v. Montefiore Hospital Association of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied*, 414 U.S. 1131 (1974). These standards apply equally as well in a situation, such as here, where the court en banc consists only of the chancellor himself, as per a local rule of court. *Cowen v. Krasas*, 438 Pa. 171, 264 A.2d 628 (1970); *Jacobson & Company, Inc. v. International Environment Corporation*, 427 Pa. 439, 235 A.2d 612 (1967).

The facts, as found by the chancellor,[2] reveal that on January 3, 1956, Food Corporation and the Redevelopment Authority of the City of Philadelphia entered into a contract for the purpose of developing a four hundred acre tract of land to be called the Food Distribution Center (Center). The plan called for a geographical relocation of the various elements of the Philadelphia wholesale food industry into the new Center. The goal was to consolidate the industry into a common market area, equipped with clean modern facilities and with sufficient space to accommodate the needs of both buyers and sellers.

The originators of the idea represented to the various merchants that each segment of the industry would be located in a separate and distinct area of the Center. Sales of each commodity would be permitted only in the

---

2. The chancellor's findings of fact are supported by the record with but one exception. *See* footnote 3, *infra.*

designated area and random expansion would not be allowed.

Wholesalers of fresh fruit and produce in the original containers (fruit merchants) had been primarily located in the Old Dock Street Market. Conditions in this market were less than acceptable. Rats infested the area, their propagation enhanced by the filth which was ever present. Long working days were the norm, and the narrow streets and lack of adequate provision for accommodating trucks engaged in loading and unloading produce resulted in almost total congestion. Under such conditions, the fruit merchants were very receptive to relocating in the Center.

These fruit merchants formed Terminal Corp. to facilitate the relocation. Terminal Corp. leased eighteen acres (Produce Market) within the Center and in turn subleased space to the individual fruit merchants. The Produce Market was enclosed by a fence equipped with a gate to insure regulation of selling hours.

The record indicates that there were numerous meetings between the redevelopers and the fruit merchants prior to the actual move. The redevelopers assured the fruit merchants on many occasions that the sale of fresh fruit and produce in the original containers would not be permitted in the Center outside the confines of the Produce Market. On several occasions, Food Corporation refused to sell or lease space in the Center, but outside the Produce Market, to wholesalers who wished to buy and sell fresh fruit and produce in the original container.

Albert Levin served as president of Levin Company at all times relevant to this action. Levin Company had had operations in the Old Dock Street Market, but their business had been limited to the processing and selling of bananas. In the parlance of the trade, bananas are not considered to be fresh fruit and produce in the original container. Levin Company was, therefore, forced to set up operations outside the Produce Market. On July 20,

1959, Levin Company purchased a three acre tract across the street from the Produce Market and constructed a building to be used in its banana business.

Although Levin Company was not located in the Produce Market, Albert Levin served as secretary-treasurer of Terminal Corp. from 1953 until 1968. He attended many meetings wherein the plans and proposals of the Center were discussed and explained. Albert Levin was well aware of the general restrictions on selling commodities in areas other than those appropriately designated, and of the specific restrictions relating to the Produce Market.

Notwithstanding, Levin Company began to make sales of fresh fruit and produce in the original container from its building across the street from the Produce Market in 1966 or 1967. Members of Terminal Corp. protested these sales to Albert Levin, and he informed them that the volume was small and that his company would cease such operations. Although Levin Company sold no produce from July, 1969 until April, 1970, a firm by the trade name of "House of Bud" sold produce from Levin Company's building during that time.

Levin Company took over the operations of House of Bud, and in May, 1970, purchased an additional one-half acre of land next to the three it already owned. It later constructed a new building to accommodate its fresh fruit and produce business, and proceeded to sell these goods on a full scale basis. Both the deed to the original three acres and the deed to the additional one-half acre expressly contain the covenants of the Redevelopment Contract and the Redevelopment Proposal.[3]

---

3. The chancellor determined in his finding of fact number 35 that the deed to the one-half acre did not contain the covenants running with the land as required by the Redevelopment Contract of January 3, 1956. However, our independent reading of the deed clearly indicates that the covenants provided for in the Redevelopment Contract *are* included in the deed.

The Redevelopment Contract and the Redevelopment Proposal incorporated therein by reference control the actual redevelopment of the Center. These documents were recorded in the Philadelphia Recorder of Deeds Office. Terminal Corporation and the named individuals contend that these documents contain covenants running with the land which segregate the Center into areas of specific use and which forbid overlap of uses.

The test for determining whether a covenant runs with the land is whether it was so intended by its creators. *Leh v. Burke*, 231 Pa. Superior Ct. 98, 331 A.2d 755 (1974); *J.C. Grille, Inc. Liquor License Case*, 181 Pa. Superior Ct. 456, 124 A.2d 659 (1956). Paragraph 11(e) of the Redevelopment Contract provides in pertinent part:

> "The foregoing covenants in this Paragraph 11 shall be covenants running with the land; and covenants to the same effect, which shall be covenants running with the land, shall be included in any deed or deeds from the AUTHORITY or from its successors or assigns to the REDEVELOPER and to the successors or assigns, conveying, or purporting to convey the land in the Project Area or any part thereof or interest therein; and shall also be included in any deed, deeds, lease, leases, agreements or encumbrances executed by the REDEVELOPER; ...."

This is more than ample proof that the creators of the covenants intended them to run with the land, and we will so consider them.

Paragraph 11(d) of the Redevelopment Contract provides the following limitation on use:

> "To devote each Parcel or any portion thereof in the Project Area, after it shall have been conveyed to the REDEVELOPER, substantially to the uses specified therefor in the Redevelopment Proposal and this Contract and not to devote any of the land to any other use or purpose."

This paragraph was amended on December 24, 1959, and the following provision was added:

"1. The foregoing shall be deemed to be complied with, in the case of any parcel or portion of the Project Area, if such parcel or portion and the buildings and improvements thereon shall be used by each occupant thereof principally and primarily for the manufacture, processing, marketing, distributing and warehousing of food, beverages, agricultural and horticultural products, and such other products as are customarily sold in any type of food store, and the furnishing of services advantageous in connection with such manufacture, processing, marketing, distributing and warehousing."

The lower court judge determined that these paragraphs were ambiguous and permitted the use of parol evidence to resolve the ambiguities.

This finding of ambiguity in the written instrument is supported by the record. A review of the myriad of papers and documents, along with the testimony of numerous witnesses and the actual actions of the Food Corporation, belies any attempt at a simple construction of the covenants in question. It is clear that the intent of those involved with the Center was to segregate the various elements of the industry and not to permit overlap within the Center. The members of Terminal Corp. obviously relied on this in relocating their businesses within the Center. Food Corporation itself affirmatively indicated that segregation was provided for in the covenants when it refused, on several occasions, to sell or lease space outside of the Produce Market for the sale of fresh fruit and produce in the original container.

Once the finding of ambiguity in the written instruments is made, it is fundamental that parol evidence may be used to ascertain the actual intention of the parties. *Parker v. Hough*, 420 Pa. 7, 215 A.2d 667 (1966); *Leh v. Burke, supra.* In such a case, extrinsic evidence can be examined and consideration may be given to the subject matter involved and the cir-

cumstances surrounding the execution of the instrument. *Castellucci v. Columbia Gas of Pennsylvania, Inc.*, 226 Pa. Superior Ct. 288, 310 A.2d 331 (1973). Further, if the language is ambiguous and the parties have put their construction on it in the past, that construction will be considered the best evidence of their intent. *Birdsall-Friedman Company v. Globe and Rutgers Insurance Company*, 326 Pa. 404, 190 A. 924 (1937); *DeSanno v. Earle*, 273 Pa. 265, 117 A. 200 (1922).

It is apparent that at all stages of the negotiations and the actual development of the Center, the principals intended the covenants to provide for segregation. The refusal of Food Corporation to sell or lease to others outside the Produce Market is proof that the restrictions did exist and were viable. As our supreme court stated in *Ryan v. Hudak*, 409 Pa. 211, 216, 185 A.2d 570, 572 (1962): "Moreover, subsequent acts of the parties, tending to show the construction they themselves placed upon the writing are important in determining their intention if such is not clearly expressed therein: (citations omitted)." Finally, the diagrams in the Redevelopment Proposal clearly indicate that wholesalers handling each major commodity group are to be placed in their own special areas within the market.

We therefore conclude that the covenants of paragraph 11 mandate a segregated market within the Center and that Food Corporation cannot transfer any interest in land which will cause a disruption of these segregated markets.

Having made the above determination, we must conclude that Levin Company is in violation of the covenants running with the land. In the absence of a finding that Terminal Corp. and the named individuals are estopped from demanding the enforcement of these covenants, we will enjoin Levin Company from further sales of fresh fruit and produce in the original containers within the Center but outside of the Produce Market.

The general rule as stated in Annot., 51 A.L.R. 3d

556 (1973), is that where restrictive covenants constitute a part of a general plan or scheme for the development of a tract of land, they may be enforced by the owner of any other lot therein. *See also* 26 C.J.S. *Deeds* §167(2)(a) (1956). However, Levin Company argues that Terminal Corp. and the named individuals are estopped from demanding enforcement of the covenants because they have participated in the breach and so do not come into court with clean hands. Levin Company also contends that the doctrine of laches now bars any cause of action against it for enforcement of the covenants.

The facts do indicate that as early as 1966 or 1967, members of Terminal Corp. were involved in produce transactions[4] with Levin Company. However, we are not convinced that the clean hands doctrine defeats the present action.

Where the rights of innocent parties are involved, the doctrine should be applied cautiously. *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968). While several of the members of Terminal Corp. have made purchases from Levin Company, many of the members have had no dealings with Levin Company, and a general ruling against Terminal Corp. on the basis of unclean hands would produce an inequitable result. This we will not sanction. *Hartman v. Cohn*, 350 Pa. 41, 38 A.2d 22 (1944). In addition, our supreme court has held that unclean hands will not operate to bar a cause of action if some of the plaintiffs are not so tainted. *Bennett v. Lane Homes, Inc.*, 369 Pa. 509, 87 A.2d 273 (1952).

We would note that the purchases made by several

---

4. Although Levin Company argues that both sales and purchases took place, we are not concerned with sales by Terminal Corp. members. There is no indication that these sales took place within the Center but outside the Produce Market, and so are irrelevant to the present action. Sales made from the Produce Market were in compliance with the covenants.

members of Terminal Corp. from Levin Company were of too small an amount to mandate a different result.[5] Levin Company's sales increased substantially from year to year and the previous acquiescence in minor violations does not preclude enforcement of the covenants where the breaches become substantial and more serious. *Kajowski v. Null,* 405 Pa. 589, 177 A.2d 101 (1962).

We are equally unconvinced by Levin Company's argument that the suit is barred by laches. We must reiterate that Albert Levin, president of Levin Company, was at all times aware of the restrictions on selling produce outside the confines of the Produce Market, and that the members of Terminal Corp. complained of the sales and requested that he cease his operations. While complaints alone will not always prevent the operation of laches, *Harris v. Susquehanna Collieries Co.,* 304 Pa. 550, 156 A. 159 (1931), under the proper circumstances, such a complaint will preserve the cause of action. *Cf., New York State Natural Gas Corporation v. Roeder,* 384 Pa. 198, 120 A.2d 170 (1956). Here, Albert Levin promised to discontinue his business of selling fresh fruit and produce in the original container outside the Produce Market. It was reasonable for the members of Terminal Corp. to rely on that promise. *See, Harris v. Susquehanna Collieries Co., supra.*

It is axiomatic that "the mere passage of time does not establish laches; laches must be determined only after all the circumstances of the case are developed: (citations omitted)." *Shapiro v. Shapiro,* 424 Pa. 120, 131, 224 A.2d 164, 170 (1966). In addition, laches will only be established if the complaining party's want of due diligence in failing to institute his action causes prejudice to another. *Siegel v. Engstrom,* 427 Pa. 381, 235 A.2d 365 (1967). When we view the case under all the

---

5. The record indicates that in 1973, Levin Company made sales to members of Terminal Corp. amounting to $105,000.00. That year, Levin Company had sales of fresh fruit and produce amounting to between $4,500,000.00 and $5,000,000.00.

circumstances, we fail to see an equitable justification for imposing laches on Terminal Corp. and its members. Albert Levin was aware of the restrictions and knew that he was in violation of them. He had been notified by Terminal Corp. that his company was to cease its operations outside the Produce Market. Terminal Corp.'s failure to immediately pursue its legal rights worked no prejudice on Levin Company. Any additional expenditures it made in nurturing its improper sales of fresh fruit and produce were made at its own risk after notice. *New York State Natural Gas Corporation v. Roeder, supra.*

The order involved in Appeal No. 1944 is affirmed. The order of the lower court in Appeal No. 1970 October Term, 1975 dismissing the complaint of Terminal Corp. and the named individuals and denying the injunction against Levin Company is reversed. The matter is remanded for a proper order in conformance with this opinion, enjoining Levin Company from further selling of fresh fruit and produce in the original container within the Center but outside the Produce Market.