GAMCO, Inc. v. PROVIDENCE FRUIT & PRODUCE BLDG., Inc., et al.

No. 4600.

United States Court of Appeals
First Circuit.

Feb. 13, 1952.

George Alpert, Boston, Mass. (Herbert Alpert, Clarice Neumann, and Alpert & Alpert, all of Boston, Mass., on brief), for appellant.

Frank Licht, Providence, R. I. (Andrew P. Quinn, Providence, R. I., on brief), for appellees.

Before CLARK[1] and WOODBURY, Circuit Judges, and FORD, District Judge.

CLARK, Circuit Judge.

This appeal brings up for review the decision of a district court, finding no violation of the antitrust laws in the ouster of a tenant, a Rhode Island corporation, from a building in Providence specially located and equipped for wholesale produce marketing, when control over the corporation passed to out-of-state interests.

Plaintiff, Gamco Incorporated, is a corporation organized under Rhode Island law and located in Providence, which purchases fruit and vegetables in truck and freight-car lots from interstate dealers for sale primarily to the bulk jobbers and retailers of the city. It brought the present action in the district court against defendant Providence Fruit & Produce Bldg., Inc., as lessor of the building in question, joining also the latter's directors and certain other Rhode Island concerns which lease space in the building. In the action plaintiff sought to enjoin alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 et seq., growing out of its exclusion

1. Judge Clark of the Second Circuit, serving by designation.

from the building, and to recover treble the damages consequentially sustained. After trial without jury the district court entered judgment for defendants on the ground in substance that whatever the attempt to monopolize or the monopoly, their acts had not actually suppressed, or tended to suppress, competition.

The facts are substantially undisputed. The Produce Building was erected sometime prior to April, 1929, by a subsidiary of the New Haven Railroad on premises owned by the Railroad and adjacent to its main freight lines. It was designed to provide selling, storage, and shipping facilities to the fresh fruit and vegetable dealers of Providence who had found themselves forced from the downtown city streets by accumulating traffic congestion. The building and its surrounding land and road approaches were leased for a total of fifty years by the subsidiary and the Railroad respectively, to the defendant corporation. It is of three floors approximately 1,000 feet long. Local wholesalers may purchase corporate stock—of which but 100 shares were authorized—and rent individual three-floor units or bays 20 feet wide for $1,800 a year. Their bulk consignments of fresh fruit and vegetables are received by street, four rail spurs of which the building tenants have exclusive use, and Yard 17 of the New Haven Road. The facilities thus provided are substantially advantageous to local wholesalers. Retail buyers habitually congregate there and the shipping facilities are the best in Providence. As a result, since 1929 practically all fruit and vegetable dealers in the area at one time or another have held leases or stock in the defendant corporation. One of the issues developed in the case was the possibility, as asserted by the defendants, of developing alternative physical accommodations of comparable utility on other space adjacent to the railroad. The parties were in the sharpest of disputes as to the desirability of such sites and of facilities upon them if and when developed. But it was not questioned that they were not now developed or that the local trade was at present centered in this building.

Plaintiff, Gamco, was organized in 1946 as successor to the wholesale concern of G. A. Mercurio, which had been leasing space in the building. To finance purchases it arranged for credit from Sawyer & Co., another wholesale fruit and produce dealer whose business was primarily in Boston. So Gamco's shareholders pledged their stock as security, reserving the voting rights at the insistence of the defendant Building Corporation. The defendant directors then granted a one-year lease of four units, but at the expiration of the life of the lease they refused renewal. Shortly thereafter the impending financial difficulties of Gamco forced the record transfer of the pledged stock to Sawyer & Co., and since that time the board has consistently declined to renew the lease. Its refusal is grounded on a covenant in the original lease wherein plaintiff agreed not to "transfer or permit to be transferred any interest in the business" without written permission from the board. In 1948 Gamco was notified to quit the premises. It failed to comply and the defendant directors instituted suit for trespass and ejectment in the Rhode Island courts, which resulted in a judgment in their favor, affirmed by the state supreme court, Providence Fruit & Produce Bldg., Inc., v. Gamco, Inc., 76 R.I. 54, 68 A.2d 20, subsequent to the filing of the complaint in the present action.

 The district court interpreted the Sherman Act in this context as condoning defendants' monopoly position as long as competition ruled the ultimate selling market subsequent to Gamco's ouster. It happens to be true that the abuses of price fixing and price leadership have been traditional criteria of illegality under the Act. See, e.g., United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. But there are other indicia of monopoly power, of which exclusion of competitors from the market is one, International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20, which are

condemned *per se* by Section 2, regardless of whether or not the position of dominance has been exploited to rig prices. American Tobacco Co. v. United States, 328 U.S. 781, 808–815, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 427–429. The Sherman Act condemns the power which makes pricing abuse possible as well as the abuse itself. United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236. Where, as here, defendants enjoy a power to deny their competitors access to the market, "evidence that competitive activity has not actually declined is inconclusive," both as to Section 3 of the Clayton Act, 15 U.S.C. § 14, Standard Oil Co. v. United States, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L. Ed. 1371, and for our present purposes under Sections 1 and 2 of the Sherman Antitrust Act.

■ Defendants contend, however, that a discriminatory policy in regard to the lessees in the Produce Building can never amount to monopoly because other alternative selling sites are available. The short answer to this is that a monopolized resource seldom lacks substitutes; alternatives will not excuse monopolization. The district court found: "Yard 17 is open to the public * * *. There is space adjacent to the Produce Building on its west side * * * as well as land owned by the City of Providence in the immediate vicinity. There is also space across the street from the Produce Building on Terminal Way which has track facilities." But it is only at the Building itself that the purchasers to whom a competing wholesaler must sell and the rail facilities which constitute the most economical method of bulk transport are brought together.[2] To impose upon plaintiff the additional expenses of developing another site, attracting buyers,

and transhipping his fruit and produce by truck is clearly to extract a monopolist's advantage. United States v. Associated Press, D.C.S.D.N.Y., 52 F.Supp. 362, 371, affirmed 326 U.S. 1, 17, 18, 65 S.Ct. 1416, 89 L.Ed. 2013. The Act does not merely guarantee the right to create markets; it also insures the right of entry to old ones. See United States v. New England Fish Exchange, D.C.Mass., 258 F. 732; United States v. Tarpon Springs Sponge Exchange, 5 Cir., 142 F.2d 125.

Thus in American Federation of Tobacco Growers v. Neal, 4 Cir., 183 F.2d 869, 872, defendant trade association, which regulated and administered tobacco warehouse sales in the Danville, Virginia, area, denied plaintiff co-operative access to the local auctions. Plaintiff tried to proceed independently, but failed to attract buyers enough to make his own auctions a success. Holding that the exclusion of competing warehousemen constituted a violation of the Sherman Antitrust Act, the court said, " * * * having set up the market in this way, defendants may not be heard to say that they have not established a monopoly merely because they do not interfere with an outside warehouse if it can shift for itself." To the same effect is United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810, holding illegal the control of existing approaches to St. Louis by less than all competing railroads.

■ Admittedly the finite limitations of the building itself thrust monopoly power upon the defendants, and they are not required to do the impossible in accepting indiscriminately all who would apply. Reasonable criteria of selection, therefore, such as lack of available space, financial unsoundness, or possibly low business or ethical standards, would not violate the standards of the Sherman Antitrust Act.[3]

2. The importance of rail service to the plaintiff company can be seen by the fact that in 1948 plaintiff received some 350 carlots through the New Haven Railroad, more than all but three of the other nineteen tenants.

3. Thus the reasonableness of certain types of concerted trade organization activity has long been recognized, subject, however, to the natural qualification that

they do not have "an inevitable tendency to destroy real competition" by reason of the unarticulated uses to which the members may put information or facilities thus acquired. See, e.g., Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 613, 34 S.Ct. 951, 58 L.Ed. 1490; American Column & Lumber Co. v. United States, 257 U.S. 377, 411, 42 S.Ct. 114, 66 L.Ed. 284;

But the latent monopolist must justify the exclusion of a competitor from a market which he controls. Where, as here, a business group understandably susceptible to the temptations of exploiting its natural advantage against competitors prohibits one previously acceptable from hawking his wares beside them any longer at the very moment of his affiliation with a potentially lower priced outsider, they may be called upon for a necessary explanation. The conjunction of power and motive to exclude with an exclusion not immediately and patently justified by reasonable business requirements establishes a prima facie case of the purpose to monopolize. Defendants thus had the duty to come forward and justify Gamco's ouster. This they failed to do save by a suggestion of financial unsoundness obviously hollow in view of the fact that the latter's affiliation with Sawyer & Co. put it in a far more secure credit position than it had enjoyed even during its legal tenancy. We therefore hold that, although selection and discrimination among those who would become lessees was necessary, defendants have failed to show that the basis for their action here was innocent of the economic consideration alleged.

We are of course familiar with and appreciate the sound value of the rule, so stressed by defendants, that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." F.R. C.P., Rule 52(a), 28 U.S.C.A. But our reversal in this case, the product of a "definite and firm conviction that a mistake has been committed," United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, does not require us to modify substantially any of the facts as found by the trial court; error was committed rather in the law which was applied to these facts.

■ First, as we have indicated, the district court found the possibility of duplicating the physical facilities of the building elsewhere along the line of the New Haven Railroad. We accept this finding. But we do not endorse the assumption that this fact can of itself destroy the illegality of the asserted monopolization. It is clear, from the various cases we have cited above, that exclusion from an appropriate market or business opportunity is actionable, notwithstanding substitute opportunities—e. g., the facilities of the United Press in United States v. Associated Press, supra.

Second, the court concluded that there was no clear proof of an articulated concert to exclude non-residents or foreigners as such. Were decision to turn upon this point, we might well find difficulty in accepting this view. For there was, in fact, strong evidence to the contrary. It was undisputed, for example, that Gamco's exclusion was contemporaneous with and grew out of its affiliation with the non-Rhode Island Sawyer & Co.; that a covenant frankly binding the lessee not to transfer any corporate interest to "anyone not a bona fide resident of said State" had been specifically included in certain past building leases; that the board had investigated previous out-of-state credit affiliations by existing tenants, and specifically one such previous connection with Sawyer & Co., itself; and that the board had rejected lease applications by non-local firms and requests for permission to sublease or transfer corporate interests to such firms by existing tenants, the sole exceptions to this policy being leases to a Fall River wholesaler and to noncompeting fish, egg, and banana merchants.[4] Nonetheless, we need not overturn

---

United States v. American Linseed Oil Co., 262 U.S. 371, 388, 389, 43 S.Ct. 607, 67 L.Ed. 1035; Sugar Institute v. United States, 297 U.S. 553, 597–600, 56 S.Ct. 629, 80 L.Ed. 859.

4. Nor was the oral evidence entirely one way as to nonexistence of a conspiracy against outside competition. Although strong in his denial of such a policy, the testimony of A. M. Tourtellot, a member of the board since the market was built, thus includes the following:

"Q. Is it true, in addition to that reason, one of your other reasons to keep out outside dealers was in order to protect the local dealers in the building from competition? A. Protect local dealers, that we always tried to do. We always have tried to do it."

"Q. In your direct testimony, I think you said that if an applicant was to

this finding, for the failure conclusively to prove such a conspiracy is not fatal to plaintiff's cause as a matter of law. As indicated above, it is incumbent on one with the monopolist's power to deny a substantial economic advantage such as this to a competitor to come forward with some business justification. Since none was offered we must hold the exclusion unjustified.

■ We turn last to the trial judge's statement in his opinion that "I agree with the defendants' contentions that this is an attempt to re-try the trespass and ejectment case dressed up in the language of the Sherman Act." This may suggest the question whether in fact the previous litigation can have the effect of collateral estoppel. But no such defense was pleaded and the parties appear not to have pressed the point beyond incidental atmospheric reference. We conclude that in any event there is no bar. The opinion in Providence Fruit & Produce Bldg., Inc. v. Gamco, 76 R.I. 54, 68 A.2d 20, shows that Gamco attempted to raise the issue of Sherman Act illegality here sued upon as an equitable defense in the state trial court and was met with a plaintiff's demurrer, which was sustained by the court. The state supreme court affirmed the trial court and stated, inter alia, that this particular equitable defense would not be available in the law action of trespass and ejectment, citing earlier cases. Of course no judgment can be conclusive as to issues denied adjudication in the action in which it was rendered.[5]

We therefore conclude that the judgment for defendants must be reversed and the action remanded. Upon remand the district court will proceed to ascertain and award the damages and appropriate counsel fees and further to determine as a court of equity the extent to which equitable relief should be awarded. In this it should be guided by the aim to restore plaintiff to its former competitive position so far as this can be done without taking away rights from innocent third persons. Thus the plaintiff should be accorded space in the building as a tenant on terms similar to those accorded others, at once if available without dispossessing such innocent parties, otherwise as soon as available.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings in accordance with this opinion; appellant recovers costs on appeal.

---

be granted a lease, the board of directors must be satisfied that if he became a tenant his competition would be fair? A. That's right."

"Q. I don't understand it. How would any man be on different terms from the rest of you? A. Well he might have stores in other places. Whereas, if he had a store in New York, one in Providence, one in Philadelphia, we would be unable to compete with him because he would have the advantage of being able to keep his man in the shipping district to buy, or to advance the shippers, or to solicit. A little fellow in the building couldn't afford to. And he might lose money here in Providence and make it in New York, he would exist but we would not. We couldn't exist on that, because he could lose money in Providence. We would have to really do something because we couldn't compete with that kind of competition."

5. There was also discussion and decision by the supreme court that the then defendant had not properly preserved its exceptions to the ruling below. The converse proposition, to wit, failure to plead a legal defense in a particular equitable action, appears to have been held a bar to later suit by a divided court in Wholey v. Columbian Nat. Life Ins. Co., 69 R.I. 254, 32 A.2d 791, 33 A.2d 192. But what the Rhode Island law is on these matters we need not examine in significant detail. For here it is clear that through procedural difficulties a decisive legal issue between the parties has not been tried prior to the present action.