JETRO CASH AND CARRY
ENTERPRISES, INC.

v.

FOOD DISTRIBUTION CENTER and
Philadelphia Fresh Food
Terminal Corp.

Civ. A. No. 81–3922.

United States District Court,
E.D. Pennsylvania.

Aug. 15, 1983.

Judah I. Labovitz and Benjamin A. Levin, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for plaintiff.

Louis J. DiGiacomo, Philips, Curtin & DiGiacomo, Philadelphia, Pa., for Philadelphia Fresh Food Terminal Corp.

## MEMORANDUM

GILES, District Judge.

The parties dispute whether a restrictive covenant in plaintiff's deed legally precludes the conduct of certain business within the Philadelphia Food Distribution Center. Specifically, can plaintiff be restrained from selling fresh fruit and produce in the original container within the confines of the Food Distribution Center but outside of the Produce Market, which is a part thereof? Philadelphia Fresh Food Terminal Corporation ("PFFTC") answers in the negative, arguing that the restrictive covenant runs with the land. Plaintiff answers affirmatively, arguing that the covenant and actions of PFFTC violate the antitrust laws.

Jetro Cash and Carry Enterprises, Inc. ("Jetro") arrived at the courthouse first, instituting suit based upon sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1976). PFFTC counterclaimed, asserting that Jetro was violating the restrictive covenant. Preliminary injunctive relief was granted in favor of Jetro, giving the parties time to engage in discovery and brief the various issues. A bench trial was held in December of 1982. The following constitute my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1. Jetro, a wholly owned subsidiary of Jetro Holding, Inc., is a corporation organized under the laws of New York. The Jetro concept is "one stop" wholesale shopping, offering a complete line of grocery products to restaurants, grocery and convenience stores and vendors.

2. The Food Distribution Corporation ("FDC"), a nonprofit Pennsylvania corporation, was and remains the Redeveloper of the Philadelphia Food Distribution Center ("the Center"), pursuant to a contract with the Philadelphia Redevelopment Authority ("RDA"). The Center stretches approximately four hundred (400) acres in South Philadelphia and houses a large variety of wholesale food merchants.

3. PFFTC is a corporation organized under the laws of Pennsylvania. Its shareholders consist of wholesale merchants of fresh fruit and produce in the original containers. That is, the product is resold in the same packaging used for shipping.

4. PFFTC now leases eighteen (18) acres of the Center from FDC. This area is known as the Produce Market. PFFTC subleases the 70 individual store units located therein to its shareholders.

5. Before the Center's redevelopment, the wholesale merchants of fresh fruit and produce in the original container were located at the Old Dock Street Market. Conditions there were extremely crowded and unsanitary.

6. In December of 1955, a redevelopment contract was authorized by City Council and approved by the Mayor. Under this contract, dated January 3, 1956, FDC acted as the redeveloper of the Center, submitting all plans to the RDA for approval. The contract was duly recorded.

7. PFFTC was formed to represent the merchants of the Old Dock Street Market in negotiating their possible relocation to the Center.

8. Between early 1956 and July, 1959, members of PFFTC negotiated with representatives of FDC. On many occasions, authorized representatives of FDC told officers, directors and stockholders of PFFTC that the sale of fresh fruit and produce in the original container would not be permitted in the Center outside the confines of the Produce Market.

9. The first lease between FDC and PFFTC for rental of the Produce Market was executed on November 7, 1957.

10. Paragraph 11(d) of the original Redevelopment Contract required FDC, its successors and assigns:

to devote each Parcel or any portion thereof in the Project Area, after it shall have been conveyed to the redeveloper, substantially to the uses specified therefor in the Redevelopment Proposal and this Contract and not to devote any of the land to any other use or purpose.

This restriction was to be in force for a forty year period. In 1959, this paragraph was amended and the following provision added:

1. The foregoing shall be deemed to be complied with, in the case of any parcel or portion of the Project Area, if such parcel or portion and the buildings and improvements thereon shall be used by each occupant thereof principally and primarily for the manufacture, processing, marketing, distributing and warehousing of food, beverages, agricultural and horticultural products, and such other products as are customarily sold in any type of food store, and the furnishings of services advantageous in connection with such manufacture, processing, marketing, distributing and warehousing.

11. Paragraph 11(e) of the Redevelopment Contract provides:

The foregoing covenants in this paragraph 11 shall be covenants running with the land; and covenants to the same effect, which shall be covenants running with the land, shall be included in any deed or deeds from the Authority or from its successors or assigns to the Redeveloper and to its successors or assigns, conveying, or purporting to convey the land in the Project Area or any part thereof or interest therein; and shall also be included in any deed, deeds, lease, leases, agreements or encumbrances executed by the

Redeveloper; provided, that the covenants in subparagraph (d) of this paragraph 11 shall cease and determine at the expiration of forty (40) years from the date of this Contract.

12. The disputed covenant set out in the preceding paragraphs is facially ambiguous. However, it was interpreted by the Pennsylvania Superior Court in *Philadelphia Fresh Food Terminal Corporation v. M. Levin & Co., et al.*, 239 Pa.Super. 287, 361 A.2d 886 (1976), *petition for allowance of appeal denied per curiam,* (May 4, 1977). After admitting extrinsic evidence on the issue of the covenant's meaning, the *Levin* Court interpreted it to mandate segregated markets. 239 Pa.Super. at 297, 361 A.2d at 891–92. In other words, the covenant prohibited the sale of fresh fruit and produce in the original container within the Center but outside of the Produce Market.

13. The *Levin* decision was never recorded with the original or amended redevelopment contract. Jetro was not a party to the *Levin* action, although FDC was a party defendant.

14. The members of PFFTC sell fresh fruit and produce in the original containers in sixty-seven of the seventy units within the Produce Market. The remaining three units are sublet to restaurants or other support services. Many produce merchants lease more than one unit. There are only thirty-six different entities occupying the sixty-seven available units.

15. All of the tenants except the three restaurants are stockholders of PFFTC. There are two stockholders who are not tenants within the Produce Market.

16. All units within the Produce Market are currently occupied. On several occasions in the past, FDC has refused to sell or lease space within the Center but outside the Produce Market to those who sell fresh fruit and produce in the original container.

17. The Produce Market spans Galloway Street, with thirty stores on one side of the street and forty units on the other side. Gates have been erected across Galloway Street which are locked when the Market is closed. Thus, the Market is well insulated from the remainder of the Center.

18. The hours during which the Produce Market is open for business are established by rules and regulations of Terminal Corporation. Market selling hours for wholesalers within the Produce Market are from 4:00 a.m. until noon and from 6:00 p.m. to 10:00 p.m., Monday through Thursday; from 4:00 a.m. until noon on Friday, and from 1:00 p.m. until 9:00 p.m. on Sundays. The Produce Market is closed on Saturdays.

19. The limitation on hours is strictly enforced by PFFTC. A paid employee stands guard at the north gate to control who has access to the Market when it is closed. According to the by-laws of PFFTC, failure to observe these hours may result in the imposition of fines.

20. A merchant seeking entry into the Produce Market must purchase stock from a departing merchant or PFFTC itself. The Board of Directors of PFFTC has the power to veto a stock transfer, essentially denying a merchant entrance to the Market. The decision is based upon criteria such as good moral character, financial stability and experience in the business.

21. Members of PFFTC have, on a few occasions, taken or solicited orders or quoted prices over the telephone when the Produce Market was closed. In addition, these telephone orders were taken from warehouses which were located within the Center but outside the Market. The telephones located in the warehouses bear the same numbers as those in the stalls within the Market.

22. The Merchant's Warehouse Company purchased twelve point seven (12.7) acres of land from the RDA and FDC in 1964. This property, known as the Merchant's Warehouse, is located at 10th Street and Pattison Avenue, within the Center, but outside of the Produce Market. In 1981, it was sold to the Philadelphia Authority for Industrial Development ("PAID"), which, in turn, entered into an installment sale agreement with Jetro.

23. The restrictive covenant is contained in the deeds transferring the property to the Merchant's Warehouse Company and to PAID, as well as in the agreement of sale

between PAID and Jetro. Thus, Jetro had actual knowledge of the covenant's existence.

24. In 1980, while Jetro was still choosing a site for their operation, its attorney and real estate agent met with Dougherty, a representative of both FDC and PAID. At that time, Dougherty related the essence of the *Levin* holding to Jetro's agents.

25. On August 14, 1981, Jetro received a letter memorializing a telephone conversation between the attorney for PFFTC and Jetro's Financial Vice-President. The letter described the holding in *Levin* and had a copy of that opinion attached. The letter also advised that PFFTC would vigorously oppose the sale of fresh fruit and produce in the original container within the Center but outside of the Produce Market.

26. On October 14, 1981, Jetro opened a wholesale facility in the Merchant's Warehouse. Jetro has never sought entry into the Produce Market.

27. Jetro carries a full line of grocery items, all of which are resold in the original container. It is strictly a "cash and carry" business; no credit is extended. Presently, Jetro buys its fresh fruit and produce from members of PFFTC.

28. Approximately two percent (2%) of Jetro's business is generated from the sale of fresh fruit and produce in the original container. It is undisputed that these goods are sold within the Center but outside of the Produce Market.

29. FDC does not, and never has, contested Jetro's activities. As a party defendant in *Levin,* FDC opposed PFFTC's enforcement of the covenant.

30. Jetro's novel concept of one-stop shopping will be undermined to some extent if it is prohibited from selling fresh fruit and produce in the original container.

31. Jetro has an advertised pricing policy, allowing potential customers to know the prices being charged for a particular item in advance. These advertised prices are guaranteed for a week. Different prices are charged only when there is a downward fluctuation in the market price which is passed along to the customer. Je-

tro's guaranteed prices apply to fresh fruit and produce.

32. The effect of the covenant is limited to a relatively small geographic area of the four hundred (400) acres that comprise the Food Distribution Center.

33. Members of PFFTC are in direct competition with fruit and produce markets within a radius of approximately one hundred to one hundred and fifty (100–150) miles around Philadelphia. Competing markets are found in Vineland and Newark, New Jersey, New York City, Baltimore, Maryland, South Carolina, as well as in Reading, Allentown and Lancaster, Pennsylvania. Larger purchasers often deal simultaneously with more than one of these markets.

34. Segregated markets allow buyers to make immediate comparisons with respect to a product's quality and price. The close proximity of the competition affords the seller little chance to deceive or misrepresent the product. It has the effect of bringing buyer and seller together.

35. Uniform hours of operation do eliminate competition with respect to hours. However, PFFTC considers the peculiar needs of its buyers when setting those hours. This limitation promotes comparison buying. In addition, the uniform hours help minimize labor costs, a savings which is passed along to the buyer.

36. Nothing contained in the RDA's enabling statute or state regulations makes the covenant mandatory or an expressed state policy. Nor does the state actively supervise its enforcement.

37. The RDA is not involved in monitoring or enforcing the covenant and there is no evidence that the RDA has any interest in its enforcement.

## II. DISCUSSION

Jetro characterizes the behavior of PFFTC as a horizontal attempt to restrain competition in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976). Jetro argues that there is little competition within the Produce Market as

it is controlled by only thirty-six entities who have a veto power over new entrants. In addition, entry is limited by the space available; presently none. However, the gravamen of Jetro's antitrust claims focuses upon the covenant and strictly enforced hours of operation. It claims that the latter decreases intra-market competition and the former eliminates inter-market competition by preventing other markets from locating within the Center. With respect to the section 1 claim, Jetro contends that this is an appropriate case for imposition of the *per se* rule. In the alternative, Jetro argues that PFFTC's behavior violates the Sherman Act under a Rule of Reason analysis.

PFFTC contests Jetro's antitrust claims and affirmatively asserts the doctrines of collateral estoppel and state action. In an attempt to rebut PFFTC's counterclaim based upon the covenant, Jetro attacks its validity and enforceability. For the sake of organizational clarity, I will address the antitrust and state law covenant issues separately.

### A. Antitrust Issues

### 1. Collateral Estoppel and State Action

As a threshold matter, PFFTC contends that Jetro's claims under the Sherman Act are barred by the state action exception and collateral estoppel. Both asserted defenses are inapplicable here.

■ PFFTC argues that the decision in *Levin* precludes litigation of the antitrust issues in this forum. Articulation of the first requirement of collateral estoppel shows the error in this position. One invoking the doctrine must prove that "the issue decided in the prior adjudication was identical with the one presented in the later action ..." *Pub. Serv. Mut. Ins. Co. v. Cohen,* 616 F.2d 704, 707 (3d Cir.1980) (quoting *Safeguard Mutual Ins. Co. v. Williams,* 463 Pa. 567, 574, 345 A.2d 664, 668 (1975)).

The antitrust issues raised here were not litigated and decided by the *Levin* court. More importantly, the Pennsylvania courts *could not* decide these issues—jurisdiction over federal antitrust claims is vested exclusively in the federal courts. Thus, collateral estoppel is not applicable to the Sherman Act issues.[1]

The Pennsylvania Urban Redevelopment Law, Pa.Stat.Ann. tit. 35 § 1701–1747 (Purdon's 1977), authorizes municipalities to establish local redevelopment authorities. The statute also permits these authorities to enter into redevelopment contracts which contain covenants running with the land. Pa.Stat.Ann. tit. 35 § 1711(b). PFFTC characterizes these statutory provisions as sufficient "state action" to bar Jetro's antitrust claims under the doctrine articulated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and progeny. However, this argument is simply not supported by the law upon which PFFTC relies.

■ Under the statutory framework, it is the municipality, rather than the state, which determines the need for a redevelopment authority. *See* Pa.Stat.Ann. tit. 35 § 1704(b). Moreover, the local authority enters into contracts and decides whether to incorporate restrictive covenants running with the land. Pennsylvania's role here was limited to the enactment of an enabling statute. Therefore, municipal, rather than state action, is challenged. The Supreme Court has held that the actions of municipalities which restrict competition are not immune from the antitrust laws. *City of Lafayette, Louisiana, et al. v. Louisiana Power & Light Co.,* 435 U.S. 389, 407–08, 98 S.Ct. 1123, 1133–34, 55 L.Ed.2d 364 (1978). To hold otherwise would seriously affect the viability of the antitrust laws, in light of the staggering numbers of cities.[2] *Id. City of Lafayette,* which mandates the re-

---

1. For a discussion of the preclusive effects of *Levin* on other issues raised by Jetro, *see* Section B(1) *infra.*

2. As the Court aptly noted; "[i]f municipalities were free to make economic choices counseled solely by their own parochial interests and

without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established." *City of Lafayette,* 435 U.S. at 408, 98 S.Ct. at 1134.

jection of PFFTC's position, was recently reaffirmed by the Court in *Community Communications Co. v. City of Boulder, Colo.,* 455 U.S. 40, 102 S.Ct. 835, 841–43, 70 L.Ed.2d 810 (1982).

■ The traditional teachings in the state action area indicate that the *Parker* doctrine will apply only where the restraint is "clearly articulated and affirmatively expressed as state policy" and where the policy is "actively supervised by the State itself." *See e.g., California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135 (Brennan, J.). Given my conclusion that the decision to place a covenant in a contract is municipal action, it is unlikely that the RDA was acting pursuant to a clearly expressed and actively supervised policy imposed by Pennsylvania. *Boulder* presented a factually similar situation. There, the Colorado Constitution granted municipalities local "home rule autonomy." Boulder enacted a restrictive cable television ordinance which was challenged under the antitrust laws. Plaintiff made the same argument proffered by PFFTC here—that a general grant of power to a municipality rose to the level of state action. The Court rejected this argument, also laying to rest PFFTC's contention. Applying the traditional test, the Court stated:

> But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere neutrality respecting the municipal actions challenged as anticompetitive. A State that allows its municipali-

ties to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought.

\* \* \* \* \* \*

Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of "clear articulation and affirmative expression" that our precedents require.

102 S.Ct. at 843. Although the Redevelopment Act did specifically mention covenants running with the land, its position was also neutral—allowing a municipality to "do as they please." Nor does it appear that the specific anticompetitive effects of this covenant could be contemplated. Therefore, like the ordinance in *Boulder,* the general contract power granted to potential redevelopment authorities cannot be characterized as a clear articulation of state policy. PFFTC also failed to introduce any evidence of the second prong of the state action test—active state supervision. Therefore, PFFTC's state action defense must be rejected.[3]

### 2. *Section 2: Monopolization*

■ Section 2 of the Sherman Antitrust Act is not aimed at "monopolies," but rather at the act of "monopolization" *See United States v. Aluminum Co. of America,* 148 F.2d 416, 429 (2d Cir.1945).[4] A cause of action under this section requires proof of two elements: "monopoly power in the relevant market" and "the willful acquisition or

---

**3.** PFFTC raises another procedural obstacle, contending that Jetro has failed to join an indispensable party—the RDA. Although this ground is raised in PFFTC's proposed findings of fact, it is not discussed in the accompanying memorandum. As between Jetro and PFFTC, it does not appear that RDA's presence is needed to grant complete relief as required under Fed.R.Civ.Pro. 19(a). PFFTC has not indicated, nor do I discern how, RDA's absence will subject it to a "substantial risk of incurring double, multiple, or otherwise inconsistent obligations ...." *See* Fed.R.Civ.Pro. 19(a). Finally, it does not appear that the RDA has any interest in this case. The RDA has not attempted to

enforce the covenant, nor was it a party in *Levin.* Maintenance of segregated markets inures directly to the benefit of PFFTC, rather than the RDA. Any conceivable interest which the RDA has will be adequately protected by PFFTC's zealous enforcement of the covenant. Therefore, the RDA is not an indispensable party.

**4.** The statute provides that "[e]very person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States ... shall be deemed guilty ...." 15 U.S.C. § 2 (1976).

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Monopoly power is defined as the ability to control prices or exclude competition. *See e.g., Grinnell,* 384 U.S. 571, 86 S.Ct. 1704; *United States v. E.I. duPont deNemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed.2d 1264 (1956); *Dimmitt Agri Ind., Inc. v. CPC Intern. Inc.,* 679 F.2d 516, 525 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 26 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

■ Resolution of a section 2 claim will often depend upon the definition of the relevant market. How the relevant market is defined will determine what percentage of the market share the alleged violator holds. This will, in turn, be probative of an ability to control prices or exclude competitors. The concept of "relevant market" embodies two distinct ideas—product and geographic market. Here, the relevant product market is undisputedly fresh fruit and produce in the original container. However, Jetro and PFFTC disagree as to the appropriate geographic market. Jetro contends that it is only the Food Distribution Center, although it failed to introduce any evidence in support of that proposition. In other words, Jetro maintains that those who buy from merchants within the Center will buy only from those merchants—that it is not geographically feasible for them to buy elsewhere. By this measure, PFFTC would hold one hundred percent (100%) of the relevant market. Given the covenant, the hours limitation and the veto power of the members with regard to new entrants, PFFTC would certainly possess the power to exclude competition. However, PFFTC argues that the relevant geographic market is much larger, encompassing a radius of approximately one hundred to one hundred and fifty miles from Philadelphia. Testimony offered by PFFTC showed that there are competing merchants within the mar-

kets located in New Jersey, New York, Baltimore, Reading, Allentown, Lancaster and South Carolina. It would be almost inconceivable for PFFTC to exert control over prices or competitors within such a large area and no evidence was offered to that effect. Without the ability to control price or exclude competitors, PFFTC would lack the monopoly power necessary for a section 2 violation. Thus, choosing the relevant geographic market will effectively determine this issue.

■ The Supreme Court, in the seminal *duPont* "cellophane" case noted that a market "is composed of products that have reasonable interchangeability for the purposes for which they are produced . . . ." *E.I. duPont,* 351 U.S. at 404, 76 S.Ct. at 404, 76 S.Ct. at 1012. Geographically, a market is the "area of effective competition," where a buyer can practicably and feasibly turn to make its purchases. *See United States v. Phillipsburg National Bank & Trust Co.,* 399 U.S. 350, 362, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658 (1970). Therefore, the question here is how far can purchasers feasibly go to buy fresh fruit and produce in the original container, given the perishable nature of the goods? Obviously, for a Philadelphia business, the market in South Jersey or Newark would be fairly convenient. Indeed, the only evidence on the relevant geographic market was offered by PFFTC. It indicated that the Produce Market was in direct competition with markets from New York to South Carolina. Many of the larger purchasers deal with more than one market as a matter of course. In addition, an increase in price in Philadelphia would likely send wholesale buyers to New Jersey. Thus, I cannot accept Jetro's limited definition of the relevant geographic market. I conclude instead that the area of effective competition forms a one hundred to one hundred and fifty mile radius around the Food Distribution Center.

Jetro introduced no evidence to show that PFFTC has the power to exclude competitors or control prices outside the confines of the Food Distribution Center. Competitors

could open businesses selling fresh fruit and produce in the original container directly across the street from the Center and PFFTC would be at a loss to stop them. If it lacks the ability to control prices or competition across the street, PFFTC certainly cannot be said to exert such pressure within one hundred miles of the center. Absent proof of monopoly power, Jetro's section 2 claim fails.

### 3. *Section 1: Unreasonable Restraints on Trade*

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . ." 15 U.S.C. § 1 (1976). However, since every contract works a restraint, the statutory language cannot be read literally. Instead, it has been interpreted to proscribe only unreasonable or unjustified restraints on competition. *See e.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 342, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). The anticompetitive effects of the challenged behavior must be balanced against any pro-competitive benefits in the context of a given market. As Justice Brandeis observed in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.

246 U.S. at 238, 38 S.Ct. at 243. This oft quoted passage describes the analytical framework known as the Rule of Reason. However, some activities are so inherently anticompetitive as to render an analysis of the marketplace virtually futile. These are practices "which because of their pernicious effect on competition and lack of any re-deeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Rice v. Norman Williams Co.,* —— U.S. ——, 102 S.Ct. 3294, 3299 n. 5, 73 L.Ed.2d 1042 (1982) (citations omitted). Instead of being analyzed under the Rule of Reason, these activities are conclusively presumed illegal *per se.* The *per se* rule is drastic and is only used "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it . . . . *Maricopa County,* 102 S.Ct. at 2473. *See also Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19 n. 33, 99 S.Ct. 1551, 1562 n. 33, 60 L.Ed.2d 1 (1979) (restraint will be deemed illegal *per se* only after courts have considerable experience with that type of behavior); *Larry V. Muko, Inc. v. Southwestern Pa., etc.,* 670 F.2d 421, 426 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982) (same). Price fixing, division of markets, typing arrangements and group boycotts are the practices generally recognized as illegal *per se. See Maricopa County,* 102 S.Ct. at 2473 n. 15 (quoting *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). Therefore, the first step in a section 1 analysis is to determine the appropriate standard in light of the nature of the challenged behavior.

However, before selecting the appropriate legal standard, a threshold issue must be resolved. PFFTC contends that there is no concerted activity as required under section 1. Since it was not a party to the redevelopment contract between the RDA and FDC, PFFTC argues that no "contract, combination . . . or conspiracy . . ." exists. The redevelopment contract was signed on January 3, 1956. Negotiations between FDC and PFFTC began in January of 1956 and lasted through June of 1959. It is conceivable that the covenant was placed in the contract at least in part to induce PFFTC to relocate to the Center. However, assuming that the members of PFFTC had no connection with the covenant's inception, it does not follow that a section 1 claim is barred. A formal con-

tract or explicit agreement is not necessary under section 1, provided that there is some concerted, joint, or collaborative action. *See, e.g., United States v. General Motors Co.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1243 (3d Cir.1975). Here the individual members of PFFTC acted in concert to enforce the covenant. In addition, the hours of operation were a product of the agreement of all members through the corporation's by-laws. The requisite "contract, combination . . . or conspiracy" is therefore present.

■■■ Jetro labels the actions of PFFTC as a *horizontal* restraint and advocates the applicability of the *per se* rule. A horizontal restraint has been defined as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). Horizontal boycotts and division of markets have been routinely held illegal *per se. See e.g., Topco,* 405 U.S. at 608, 92 S.Ct. at 1133 (division of markets); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967) (division of markets); *Radiant Burners, Inc. v. Peo-*

*ples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (boycott; *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). However, talismanic invocation of the word "horizontal" does not automatically mandate application of the fatal *per se* rule. The restraints at issue here do not fall into the traditional boycott or division of markets category.[5] The PFFTC merchants have not refused to deal with Jetro, as was the case in *Klor's.* To the contrary, Jetro buys its fresh fruit and produce in the original container from members of PFFTC. Nor has Jetro been denied access to the Produce Market—Jetro has not attempted to gain entry into the Market. Although there are at present no empty units, Jetro was and remains free to apply and wait for the next available space.[6] Finally, PFFTC did not divide markets or accord exclusive dealerships to minimize competition in a given geographic area. *See Topco,* 405 U.S. at 602, 92 S.Ct. at 1130. To be sure, competition has been geographically limited to 18 out of 400 acres. However, within those 18 acres, competition is intensified, rather than eliminated. Thus, the behavior of PFFTC does not fall within any of the traditional *per se* categories.[7] Nor is there any persuasive

---

5. Nor do the restraints fall into the other traditional *per se* categories. There is absolutely no evidence of a tying arrangement and although the market facilitates finding out what the competition is charging, there is likewise no allegation of price fixing.

6. In advocating application of the *per se* rule, Jetro cites the First Circuit's decision in *Gamco, Inc. v. Providence Fruit and Produce Bldg., Inc.,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). *Gamco,* although factually similar to this case, is distinguishable in a crucial respect. *Gamco* involved a merchant's *exclusion* from a produce market in Rhode Island. Gamco had been a tenant and the Board of Directors declined to renew its lease after some financial difficulties forced it to transfer its stock in the market. 194 F.2d at 486. Gamco brought suit under sections 1 and 2 of the Sherman Act and won.

   Although Jetro contends that the First Circuit used the *per se* rule, it is not clear whether Gamco's victory was premised upon section 1 or 2. Indeed, the only mention of the phrase *per se* was in connection with section 2. *Id.* at

486–87. Therefore, it is not clear whether the court did use the *per se* rule. However, even if it was used, *Gamco* involved the exclusion from a market. Jetro was not excluded from the Produce Market. More importantly, Gamco's victory was premised upon their unreasonable and arbitrary exclusion from the market. The court recognized that space limitations mandate some selection process and indicated that the selection indicia must be reasonable. 194 F.2d at 487–88. Indeed, the very criteria articulated by *Gamco* as reasonable are used by PFFTC. *See id.* at 487. Viewed in this light, *Gamco* is likened to *Radiant Burners,* where the denial of a seal of approval was based upon arbitrary and capricious standards. *Radiant Burners,* 364 U.S. at 658, 81 S.Ct. at 366. Since Jetro was not excluded from the Produce Market and in light of PFFTC's reasonable selection standards, *Gamco* is inapposite here.

7. Limitations on hours of operation have been judged by the Rule of Reason. *See Chicago Board of Trade,* 246 U.S. at 238–41, 38 S.Ct. at 243–45.

reason for extending the application of the *per se* rule. Although courts may have had experience with produce markets, as the Court in *Maricopa County,* noted, it is the kind of restraint, rather than the industry, which is relevant. 102 S.Ct. at 2476 & n. 19. The covenant, which eliminates competition in a very small adjacent geographic market, is a fairly novel restraint. Courts have not had sufficient experience with this type of regulation "to predict with confidence that the rule of reason will condemn it . . . ." *Maricopa County,* 102 S.Ct. at 2473. *Accord, BMI,* 441 U.S. at 19 n. 33, 99 S.Ct. at 1562 n. 33; *Medical Arts Pharmacy of Stamford v. Blue Cross & Blue Shield of Connecticut,* 675 F.2d 502, 505 (2d Cir.1982). Many pro-competitive benefits are asserted, which will be discussed *infra.* I therefore decline to apply the *per se* rule and instead shall analyze the challenged restraints under the rule of reason.

As noted earlier, the rule of reason balances the pro and anti-competitive effects of a restraint within the context of a given market. *See Chicago Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 243. As the Supreme Court has recently observed; "[c]ontrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Thus, I must determine whether the covenant and hours limitation has "produced adverse anti-competitive effects within the relevant product and geographic markets." *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).[8]

The asserted anticompetitive effects of the restrictions provide a suitable analytical starting point. The strictly enforced limitation on operating hours does eliminate one form of competition within the Produce Market. Merchants are unable to gain a selling advantage by opening earlier or remaining open later. The covenant arguably imposes a greater burden. Its admitted purpose and effect is to prevent a "split market" within the confines of the food distribution center. The Produce Market's limited acreage restricts the number of merchants who can compete for the sale of fresh fruit and produce in the original container within the Center. By limiting the number of merchants who can sell in a given area, competition may be lessened.

In addition to the general competitive implications of the covenant, Jetro's inability to sell fresh fruit and produce in the original container has specific ramifications. Jetro's concept of one stop shopping is apparently relatively new within the Food Distribution Center. To the extent that the covenant prevents Jetro from selling one type of product, this concept will be undermined. Jetro is also a competitive force with respect to pricing policy. Jetro advertises a price for a certain item and honors that price for a week without regard to an upward fluctuation in the market price. If the market price dips below the quoted price, Jetro will pass that savings along to the buyer. Jetro's pricing policy applies to fresh fruit and produce in the original container and their inability to sell that commodity might decrease price competition within the Center.

However, on balance, I find these anticompetitive effects to be both insignificant and justified by pro-competitive benefits. The evidence shows that only two percent (2%) of Jetro's business constitutes the sale of fresh fruit and produce in the original container. The restraint operates in an extremely limited geographic area—four hundred (400) acres in South Philadelphia. Je-

8. In *Glauser,* the Third Circuit articulated a four prong test for determining whether the Sherman Act has been violated. This adverse impact is the second part of the test. The first prong requires the statutory contract, combination or conspiracy; the third requires the object or conduct in furtherance of it to be illegal and the final is a proximate cause-injury requirement. 570 F.2d at 81. Because I do not find the necessary deleterious impact upon competition, I will not reach the other issues.

tro has free access to the Produce Market; they may wait their turn for a vacant unit like any other merchant. Alternatively, Jetro could locate outside of the Center and sell fresh fruit and produce in the original container. They may not, however, sell their two percent (2%) of that product within the Center but outside the Produce Market. In light of the large relevant geographic market and given the close proximity of the markets in Vineland and Newark, the covenant simply does not have a significant adverse effect on competition.

More importantly, the challenged restraints have pro-competitive benefits. The covenant creates a "segregated market;" a market in which only fresh fruit and produce in the original container is sold. This arrangement brings buyers and sellers together in a manner which facilitates, rather than stifles competition. A prospective buyer may visit many stalls in close proximity to one another. The quality of the produce and the prices asked can be instantly compared with the wares of another seller. The ease of comparison prevents overcharging or misrepresentations as to quality and is the very essence of competition.

The same observation may be made of the limitation on hours of operation. If one merchant opens earlier than others, during that period, buyers will have no basis for price or quality comparison. The evidence also indicated that longer hours will not be cost effective. Competition in hours of operation will drive up the cost of labor, which will in turn be reflected in the price of the commodities sold. Prices will increase without a corresponding increase in quality. Therefore, the set hours of operation reflect a balance struck by PFFTC between buyers' shopping needs and keeping labor costs down.

In *Chicago Board of Trade,* the Supreme Court upheld a grain market rule limiting the hours of price making on grain "to arrive." 246 U.S. at 239, 38 S.Ct. at 244. Although grain "to arrive" could be sold after those hours, it had to be sold at the closing price established at the end of trade that day. The restriction on hours here is more burdensome as it prohibits all selling after hours,[9] rather than just pricemaking. However, the essence of the Supreme Court's justification applies here with equal force. Like the regulation in *Chicago Board of Trade,* both the hours restriction and the covenant "create[d] a public market" for the commodity, bringing buyers and sellers together at one place and time. 246 U.S. at 240–41, 38 S.Ct. at 244–45. Competition is thereby promoted, rather than stifled.

After balancing the anti and pro-competitive effects of these restraints, I conclude that the insignificant adverse impact on trade is outweighed by the benefits. Therefore, the hours restriction and covenant survive analysis under the rule of reason and do not violate section 1 of the Sherman Act.

### B. *The Covenant*

In response to PFFTC's reliance upon the covenant, Jetro challenges its validity and enforceability. Specifically, Jetro argues that the covenant does not run with the land, is not applicable to a full line grocery wholesaler and is no longer enforceable. Jetro also maintains that they did not have actual or constructive notice of the covenant, citing PFFTC's failure to record the *Levin* decision with the redevelopment contract. PFFTC rebuts these arguments and

---

9. Jetro accused PFFTC of tolerating violations of the covenant and hours restriction by its own members. There was evidence to indicate that at least one member of PFFTC had, upon occasion, solicited bids or sales on the telephone from his warehouse when the market was closed. The warehouse was located within the Center, but outside the Produce Market. The telephone number on the telephone in the warehouse was the same as the telephone in the stall within the Center. I question whether a telephone bid or sale is sufficiently consummated to be a "sale" for purposes of the covenant or hours limitation. However, assuming violations of both restrictions by members of PFFTC, these violations were *de minimus.* Nor do those few occasions prove discrimination between members of PFFTC and non-members, as there was no probative evidence that PFFTC, as an entity, knew about and tolerated violations by its own members.

contends that *Levin* precludes relitigation of at least one of these issues.

### 1. The Preclusive Effect of Levin

In *Philadelphia Fresh Food Terminal Corp. v. M. Levin,* 239 Pa.Super. 287, 361 A.2d 886 (1976), the Pennsylvania Superior Court interpreted the same covenant at issue here. Levin operated a business across the street from the Produce Market, but within the Center. When he added fresh fruit and produce in the original container to his other wares, PFFTC instituted suit against him and FDC. Looking at the plain language of the covenant, the court decided that it runs with the land. *Id.* at 295, 361 A.2d at 890–91. With respect to its meaning, the court determined that the covenant was ambiguous and allowed the introduction of parole evidence. Focusing upon the negotiations between FDC and potential tenants, the court held that the covenant was intended to create segregated markets. Put another way, the covenant was interpreted to prohibit the sale of fresh fruit and produce in the original container within the Center but outside of the Produce Market. *Id.* at 297; 361 A.2d at 891–92. Jetro does not appear to contest *Levin*'s interpretation of the covenant's meaning, but does argue that the covenant could not run with the land.

■ PFFTC asserts collateral estoppel as a bar to relitigation of this issue. The party invoking this doctrine in Pennsylvania must prove four elements:

(1) the issue decided in the prior adjudication was identical with the one presented in the later action,

(2) there was a final judgment on the merits,

(3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and

(4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Safeguard Mutual Ins. Co. v. Williams,* 463 Pa. 567, 574, 345 A.2d 664, 668 (1975). *See also Public Service Mutual Ins. Co. v. Co-*

hen, 616 F.2d 704, 707 (3d Cir.1980); *In re Estate of Ellis,* 460 Pa. 281, 287, 333 A.2d 728, 730–31 (1975). Pennsylvania has rejected the archaic doctrine of mutuality of estoppel. *See Ellis,* 460 Pa. at 286–87, 333 A.2d at 730–31.

■ The first two prongs of the test are clearly satisfied. *Levin* decided that the covenant runs with the land in the context of a final judgment on the merits. However, Jetro must be in privity with someone in the prior adjudication such that they had a full and fair opportunity to litigate the question through that party. Levin, who stood in the same position as Jetro, shares no privity relationship with the latter. FDC was also a party defendant in *Levin.* However, FDC was not the direct grantor of Jetro's property.[10] Thus, there is no privity of contract or privity of estate between them and collateral estoppel is not applicable.

■ However, the inquiry does not end there. Whether a covenant runs with the land is a question of state law. The statement of the law, legal analysis and conclusion contained in *Levin* is therefore binding upon this court under *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and progeny. As the *Levin* court stated, in Pennsylvania whether a covenant runs with the land is a matter of intent, *see e.g., Baederwood, Inc. v. Moyer,* 370 Pa. 35, 41–2, 87 A.2d 246, 249 (1952); *Drucker v. Russell,* 279 Pa. 443, 448, 124 A. 92, 93 (1924); *Leh v. Burke,* 231 Pa.Super. 98, 107, 331 A.2d 755, 759 (1974), *petition for allowance of appeal denied* (Feb. 2, 1975); *Appeal of J.C. Grille, Inc.,* 181 Pa.Super. 456, 463, 124 A.2d 659, 663 (1956). The plain language of the covenant here manifests a clear intent to run with the land. This court need not "predict" how the Pennsylvania courts would view this covenant—*Levin* supplies the answer. Common sense also dictates this result, as do prudential considerations such as *stare decisis* and comity. Therefore, *Levin* precludes relitigation of the issue and deter-

---

**10.** FDC and the RDA transferred the land to the Merchant's Warehouse Company who sold it to PAID. PAID in turn sold to Jetro. *See* Finding of Fact 23.

mines that the contested covenant does run with the land.

## 2. Notice

Although Jetro concedes knowledge of the existence of the covenant, it contends that it had no actual or constructive notice of its meaning. In support of this argument, Jetro notes that the *Levin* decision was not recorded with the redevelopment contract and that the covenant was pronounced ambiguous in that case. *See* Plaintiff's Trial Brief at 27–28. I agree that the covenant, on its face does not read as subsequently interpreted and that PFFTC should have recorded the *Levin* opinion. Nevertheless, Jetro's notice argument is both factually and legally flawed.

■ Jetro did have actual notice of the covenant's meaning. In early 1980, when Jetro was still considering other properties, Jetro's attorney and real estate agent were informed by Dougherty, an official of both FDC and PAID, that a court order prohibited the sale of fresh fruit and produce in the original container outside of the Produce Market but within the Center. In August of 1981, shortly after Jetro signed the sales agreement, the attorney for PFFTC sent Jetro a letter and copy of the *Levin* case. The letter made it quite clear that PFFTC would oppose any attempts by Jetro to violate the covenant. Therefore, Jetro was aware of the *Levin* decision both before and after purchasing the property.

■ Moreover, if Jetro knew of the covenant's existence, which they admit, but were unsure of its meaning, a simple inquiry should have been made. However, most importantly, under Pennsylvania law, if a covenant runs with the land, it "binds the owner *regardless of knowledge* ...." *J.C. Grille, Inc.,* 181 Pa.Super. at 464, 124 A.2d at 664 (1956). Since the covenant here

does run with the land, notice is legally irrelevant to its enforceability.

## 3. The Covenant's Applicability and Enforceability

■ Jetro offers two final arguments— the covenant was not intended and should not be applied to a full service grocery wholesaler and the covenant is obsolete and no longer should be enforced. With respect to the first of these, Jetro maintains that full line stores were intended to coexist with the various segregated markets. However, the language of the covenant does not discriminate between small fruit and produce merchants and large diversified Jetros. In *Levin,* FDC was enjoined from selling or leasing to anyone selling fresh fruit and produce in the original container except PFFTC. *Levin*'s interpretation and application of the covenant failed to distinguish between kinds of merchants. Indeed, the goals of the covenant will be equally undermined by Jetro, Levin or a merchant selling only fresh fruit and produce. Jetro has pointed to no objective manifestation of an intent to exclude full service grocery operations and this argument must be rejected.

■ Finally, Jetro claims that the covenant has outlived its usefulness and should not be enforced. As support, Jetro cites the fact that FDC and RDA, as parties to the redevelopment contract, and merchants in other product markets who are also bound by the covenant, have not sought its enforcement.[11] The fact that others have chosen not to enforce the covenant does not deprive PFFTC of the right to assert it. Nor does the fact that others have so chosen indicate that the purpose of the covenant is no longer served. To the contrary, the evidence indicated that a segregated fruit and produce market still serves many

---

11. Jetro also argues that PFFTC has abandoned the covenant, referring to the occasional breaches of regulations by members. However, I concluded earlier that these violations, to the extent they exist, are *de minimus. See* note 8 *supra.* Moreover, the *Levin* court rejected a similar argument. Levin argued "unclean hands" since members of PFFTC had

purchased from him. The court noted that "unclean hands will not operate to bar a cause of action if some of the plaintiffs are not so tainted." 239 Pa.Super. at 298, 361 A.2d at 892. That principle has application here as well. Far fewer members of PFFTC engaged in the controverted activity here than in *Levin.*

of the original goals—a clean, orderly market where the forces of supply and demand may reign supreme. Thus, Jetro has failed to offer any change in circumstance that would warrant discarding the covenant.

### III. CONCLUSIONS OF LAW

1. Jetro's antitrust claims are not barred by the state action doctrine or collateral estoppel.

2. The relevant geographic market forms a one hundred to one hundred and fifty mile radius surrounding the Food Distribution Center.

3. The evidence did not establish PFFTC's monopoly power in the relevant geographic market. Therefore, covenant and hours restriction does not violate section 2 of the Sherman Act.

4. This is not an appropriate case for application of the *per se* rule.

5. Neither the covenant nor hours restriction have a significant adverse effect on competition. The pro-competitive benefits outweigh any adverse effects. Therefore, section 1 of the Sherman Act is not violated.

6. *Levin* dictates that the covenant runs with the land.

7. Although Jetro did have actual notice of the covenant's meaning, notice is not required to enforce a covenant which runs with the land.

8. The covenant is applicable to Jetro.

9. No altered circumstances exist warranting non-enforcement of the covenant.

Judgment shall be entered accordingly.

### JUDGMENT ORDER

AND NOW, this 15th day of August, 1983, for the reasons articulated in the foregoing Memorandum, it is hereby ORDERED that JUDGMENT is entered in favor of defendants and against plaintiff.